## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE
COMMISSION,

                                  **Plaintiff,**

              **v.**

TEVA PHARMACEUTICAL INDUSTRIES
LTD.,

                               **Defendant.**

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission") alleges:

### SUMMARY

1.      This action arises from violations of the Foreign Corrupt Practices Act ("FCPA") by Defendant Teva Pharmaceutical Industries Ltd. ("Teva" or the "Company"), the largest generic drug manufacturer in the world, relating to illegal payments made to foreign government officials in three countries to assist Teva in obtaining or retaining business.

2.      From at least October 2010 through at least December 2012, Teva paid bribes to a government official in Russia. From at least May 2002 through March 2011, Teva paid bribes to a government official in Ukraine. In 2011 and 2012, a Teva subsidiary in Mexico also paid bribes to government officials in Mexico. These illegal payments were made to influence regulatory and formulary approvals, drug purchase decisions, prescription decisions, and to increase Teva's market share and develop competitive advantages over competitors. Teva realized more than $214,596,170 in profits from business obtained through the use of illegal payments.

3.      These illegal payments were authorized by senior executives at Teva while knowing of or recklessly ignoring red flags which indicated a high probability that such payments were intended for, or would be paid to, foreign government officials.

4.      Teva created false books and records to conceal illegal payments to a government official in Russia and illegal payments to a government official in Ukraine.  Teva's subsidiary in Mexico also created false books and records to conceal illegal payments to government officials in Mexico.

5.      The illegal payments in Russia were improperly recorded as legitimate reductions of revenue in Teva's books and records.  The illegal payments in Ukraine were improperly recorded as sales and marketing expenses and consultancy fees in Teva's books and records. The illegal payments in Mexico were improperly recorded as legitimate reductions of revenue, and the inaccurate books and records and financial statements of the Mexican subsidiary were consolidated into Teva's financial statements, which were filed with the Commission.

6.      Teva's internal accounting controls were inadequate because they failed to prevent such payments or detect red flags which should have alerted its employees that these payments, in whole or in part, were bribes to foreign government officials.  Moreover, the internal accounting controls were circumvented to allow employees to authorize payments with little or no supporting documents.

7.      As a result of its conduct in Russia, Ukraine, and Mexico, Teva violated Section 30A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78dd-1] when it authorized or made illegal payments to foreign government officials in order to obtain or retain business.  Teva violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] when it created false books and records to conceal illegal payments in Russia and Ukraine, and

when its subsidiary in Mexico created false books and records to conceal the illegal payments in Mexico, which were then included in the subsidiary's financial statements and consolidated into Teva's financial statements.  Teva also violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by failing to have sufficient internal accounting controls in place to detect and prevent the authorization or payment of illegal payments in Russia, Ukraine, and Mexico.  Accordingly, the Commission seeks an order permanently enjoining Teva from further violations of Sections 30A, 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act.  Unless restrained and enjoined, Teva is reasonably likely to continue to violate the federal securities laws.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.      Teva, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10.     Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa].  During the relevant period, Teva maintained operations and an office in Miami.  Specifically, Teva's management of the Latin American region, the internal audit function for the Latin American region, compliance personnel, and some accounting functions were located in Teva's Miami office.  Further, Teva has consented to venue in this Court.

## DEFENDANT

11.     **Teva**, an Israeli company headquartered in Petah Tikva, Israel, is a global pharmaceutical corporation and the largest generic drug manufacturer in the world.  Teva

conducts business all over the world, including in the U.S.  Outside the U.S., Teva sells its products, directly and through distributors or other intermediaries, to government controlled entities, such as ministries of health and government-owned hospitals and clinics.  Throughout the relevant time period, Teva's common shares were registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)] and traded in the form of American Depositary Shares – representing shares of common stock – that were represented by American Depositary Receipts traded on the Nasdaq National Market from October 1987 until May 2012, when Teva transferred the listing of its American Depositary Receipts to the New York Stock Exchange.

12.     As such, Teva was required to file reports, including Form 20-F, with the Commission pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and related rules thereunder, and was an "issuer" within the meaning of the FCPA [15 U.S.C. § 78dd-1].

## RELATED ENTITIES

13.     **Teva LLC**, also known as Teva Russia, has been Teva's wholly-owned subsidiary in Russia since at least 2010.

14.     **Teva Ukraine LLC** has been Teva's wholly-owned subsidiary in Ukraine since at least 2010.

15.     **Teva Mexico** is comprised of various subsidiaries, including Sicor de Mexico, S.A., Lemery S.A. de C.V., Lemery Desarrollo y Control S.A. de C.V., Immobiliaria Lemery S.A. de C.V., Vitrium Division Farmaceutica, S.A. de C.V.,  Teva Pharmaceutical Mexico S.A. de C.V., and Ivax Pharmaceuticals Mexico, S.A. de C.V.  Teva Mexico's financial statements are consolidated into the financial statements of Teva at the parent level.

## FACTUAL ALLEGATIONS

### A.    Teva's Illegal Payments in Russia

16.    From at least October 2010 through at least December 2012, Teva agreed to pay, and did pay, an official of the government of Russia to obtain or retain business in Russia valued at approximately $197,530,681.

17.    Throughout that time period, Russia had a public healthcare system that provided universal healthcare to Russian citizens. The cost of the public healthcare, including medical care and drug treatments, was shared between the central, regional, and local governments. Beginning as early as 2001, Teva began using a Russian national ("Russian Official") and entities he owned or controlled, including a Russian company ("Russian Distributor"), to sell pharmaceutical products to Russian government entities, including Copaxone, a drug used to treat Multiple Sclerosis ("MS"). In 2003, Russian Official became a high-ranking government official in the Russian Federation, and held official positions on various government committees. He remained a high-ranking government official until March 2013.

18.    After Russian Official became a high-ranking government official in 2003, he assigned the entirety of his shares of Russian Distributor and of other affiliated companies he owned to his spouse because of  a Russian law prohibiting certain government officials from owning company stock or running businesses. However, Russian Official continued to run his businesses, and his spouse was not involved in the operations of his businesses.

19.    In 2006, Russian Official began asking Teva to increase its business with his various companies. In an internal email to a Teva executive in Israel, a Teva Russia executive referenced Russian Official's "influence in the industry" and the benefit to Teva of "getting a status of a local manufacturer and thereby outperform[ing] foreign pharma companies," "getting

the green light in federal programmes," and "more speedy and straightforward registration of products . . . ." The email also referenced Russian Official's suggestion that he could ". . . assist Teva with lobbying its business interests from the perspective of local legislation and even joint efforts in developing a law with Knesset."

20.     In or around 2008, the Russian Ministry of Health designated seven illnesses and conditions as the costliest to treat and created a program called the "Seven Nosologies" whereby the central government would cover the costs associated with treating these illnesses and conditions. MS was one of the seven nosologies, and Copaxone was approved as a treatment for MS. Beginning in or around 2008, the Russian government's purchases of Copaxone were primarily made by the Ministry of Health at annual auctions.

21.     Throughout 2008, internal Teva emails detailed Russian Official's influence as a government official, and Teva's management in Russia and Israel knew that Russian Official was a government official and expected that he would use his official position to Teva's advantage. For example, in a 2008 executive summary addressing Russian Distributor, a Teva Russia executive stated: "Transparency of [Russian Distributor] should be considered as low. Ownership structure is fully opaque. Participation of [Russian Official] and probably some other local government officials in the ownership structure is well-known. Company's top management is weak as management, but strong with its government contacts and lobbying power. Company's organisation structure unlikely is developed, and existence of business processes is questionable."

22.     In October 2008, Teva executives met with Russian Official at his home in Israel. The meeting was arranged by Russian Distributor's Director of Sales and Marketing.

23.     Shortly after the meeting, in October 2008, Russian Distributor's Director of Sales and Marketing emailed one of the Teva executives present at the meeting.  The email stated that Russian Distributor was "interested to participate in the delivery and distribution of Copaxone," and explained that the Russian government had already "defined" the government's order for Copaxone for 2009.  The email also mentioned possible "future scenarios" that could affect the "decision making" related to Copaxone sales, reminded Teva that Russian Official had had "personal involvement … in the introduction of Copaxone and other important healthcare initiatives in Russia," and explained that "it will be beneficial for Teva to grant the distribution of Copaxone to [Russian Distributor] in full or partially."

24.     In 2008, Russian Distributor's President was under investigation for corruption in Russia after allegedly making illegal payments to officials working in a Russian government agency.  At least by October 2008, senior Teva and Teva Russia executives were aware of this investigation.

25.     In January 2009, Teva learned that its insurer would no longer insure Russian Distributor's receivables if Russian Distributor defaulted on any of its debts to Teva.  Despite numerous red flags about Russian Official and Russian Distributor, Teva continued to conduct business with Russian Distributor and used Russian Distributor for new tenders (the formal process by which pharmaceutical companies were invited to submit bids to supply drugs to the Russian government).

26.     In 2009, the Russian government launched a new initiative for the pharmaceutical industry called "Pharma 2020," which directed the state to purchase all pharmaceutical products primarily from local producers by the year 2020.  As a first step of this initiative, the government

announced that all strategic lifesaving pharmaceutical products would now be required to be produced in Russia by 2020.

27.     As a result of this development, Teva began looking for a Russian company that would be capable of repackaging and distributing Copaxone in Russia.

28.     Russia's bi-annual MS government tender was scheduled to be held in the fourth quarter of 2010, and Teva sought to have a local packager in place prior to the tender.

29.     Starting in early August 2010, Teva began to focus exclusively on Russian Distributor, despite knowing that Russian Official was still a government official, and despite documented concerns regarding the transparency of Russian Distributor's structure.  At this time, Teva was continuing to use Russian Distributor for other smaller Russian government tenders. For example, in August 2010 Teva used Russian Distributor as a distributor for a Russian oncology tender.  And while some Teva Russia employees noted in emails that they did not plan to give Russian Distributor any additional discounts related to certain oncology drugs, a Teva Russia executive replied that such additional discounts were "the cost of building a relationship with [Russian Official]," adding that "this year, there was a substantial increase in the Copaxone requests from the Russian Academy of Medical Sciences," and that Teva Russia "may benefit from [Russian Official's] support in other areas as well."  Shortly thereafter, Russian Distributor sent correspondence to Teva requesting a large discount.

30.     In September 2010, Teva employees began raising concerns regarding using Russian Distributor as a distributor due to the fact that Russian Distributor had failed to timely pay Teva's bills in their prior business dealings.  In fact, after Teva employees raised concerns, a Teva Russia executive forwarded an email to senior management in Israel stating: "We suggest to cooperate [sic] with [Russian Distributor] to launch Copaxone local production.  Russian

Distributor is headed by [Russian Official] a representative from [a region in Russia] to Council of Federation of Russian Federation.  He is a Deputy Chairman of [a Federation Council Committee] and he has a position of Chairman of [another government committee]. . . .  [Russian Official]'s political network makes him a strong partner from market access stand point.  The plan is to utilize his contacts to secure our shares and minimize generics risks."

31.     Despite such concerns, Teva employees moved forward to sign a deal with Russian Distributor quickly.  First, the relationship with Russian Distributor was likely to be highly profitable, and Teva management expected that it would continue to be very lucrative in the future, potentially generating approximately $67 million more in revenue in 2011 than had been originally estimated.  Second, Russian Official threatened to damage Teva's market share in Russia if Teva did not select Russian Distributor.  Teva Russia employees met with Russian Official, and subsequently sent a summary of this meeting to a Teva Russia executive stating, in part, that Russian Official had told him that the Minister of Health "had returned from a vacation and asked in the morning if there was a confirmation that the entire project . . . would take place."  Russian Official then threatened that "both the price and the supply volumes [of Copaxone] would be purposefully lowered if a partnership with him was not established."

32.     On September 12, 2010, a Teva Russia executive emailed a finance executive in the Copaxone business unit and other Teva executives in Israel to provide the rationale for the new scheme of Copaxone business in Russia.  In the email, he asked for their approval of the proposed exclusive repackaging and distribution agreement with Russian Distributor.  The email also forwarded an earlier email from another Teva Russia executive that explained that "if we do not have the supply agreement approved and signed by [the] mid[dle] of this week we will encounter very real threat of losing a 100 million USD Copaxone business in 2011."

33.     In September 2010, Teva's proposed Copaxone agreement with Russian Distributor passed Teva's FCPA's approval process, yet Teva's due diligence forms omitted critical information.  For example, although the forms did disclose that Russian Distributor's owner was the spouse of a Russian politician, they failed to disclose that the politician in question ran Russian Distributor's operations and would be hired in part with the expectation that he could influence the decisions of the Ministry of Health (such as obtaining more funding for Copaxone purchases by the state), obtain approval in federal program tenders, obtain faster drug registrations, and increase market access and secure Teva's market share.  It also failed to disclose that Russian Distributor's President was under investigation for corruption despite the fact that Teva employees were aware of the investigation.

34.     On or about October 28, 2010, despite knowing that Russian Official was a government official who would be used by Teva, among things, for his influence and to increase market access, Teva executives signed a contract with Russian Distributor for repackaging and distribution of Copaxone in Russia.  Russian Distributor then began providing repackaging and distribution services.

35.     On or about November 12, 2010, the Russian Ministry of Health awarded Russian Distributor the contract to supply the Russian government with Copaxone for 2011.

36.     Teva directly and indirectly made use of the mails and of the means and instrumentalities of interstate commerce in connection with and in furtherance of its illegal payments to Russian Official through Russian Distributor.  Teva sent and responded to a number of emails to the Russian Distributor's President that were sent through U.S. servers.  For example, in or around November 2010, Teva Russia employees corresponded with Russian

Distributor's President about the delivery of Copaxone in Russia using emails sent through U.S. servers.

37.     In December 2010, a Teva Russia executive emailed Teva's regional executive, stating: "The dilemma [Russian Official] faces is how to protect his positions under conditions when state funded business in Russia is becoming transparent.  Besides building relationships with him I see the following tasks for the meeting:  (1) keep him as our loyal buyer (2) obtain his commitment in protecting Copaxone (access to the Minister and MoH [Ministry of Health] decision makers, leveraging Senate capabilities), push him to demand more funding for Copaxone already in early 2011 ([a Teva Russia Copaxone Unit executive] reports potential in another 400 patients/5000 packs/$4,5m sales)."

38.     In 2011, Teva Russia hired a new executive, formerly employed at a large U.S. pharmaceutical company.  After learning that Teva was conducting business with Russian Distributor, the new Teva Russia executive informed another Teva Russia executive that his former employer prohibited its employees from conducting business with Russian Distributor based on corruption concerns.  The second Teva Russia executive, who believed that Russian Official had significant influence in both the Parliament and the Russian Ministry of Health, told the new executive not to worry about it and that due diligence into Russian Distributor had been conducted by Teva.

39.     In part as a result of Teva's relationship with Russian Distributor, the quantity of Copaxone sales in Russia increased over time and Copaxone's market share grew.

40.     Between October 2010 and at least December 2012, Russian Distributor's margin, not including repackaging and distribution costs, from its relationship with Teva was

approximately $65 million.  Teva's discounts to Russian Distributor were larger on average than discounts given to other distributors Teva used in Russia.

41.     In December 2012, Teva Russia's management became aware that a prominent U.S. pharmaceutical company had been charged by the Commission for FCPA violations in part as a result of making illegal payments to Russian Official and his companies.

42.     Russian Official remained a high-ranking government official until March 2013, when he resigned his position.  Teva ceased its relationship with Russian Distributor in August 2013.  In 2016, Teva lost the last Copaxone tender, and ultimately lost its entire Copaxone market share in Russia.

43.     Teva mischaracterized its payments to Russian Distributor as legitimate reductions of revenue in its books and records.  As a result, Teva did not, in reasonable detail, accurately and fairly reflect its payments to Russian Distributor in its books and records.

**B.     Teva's Illegal Payments in Ukraine**

44.     From at least May 2002 through March 2011, Teva agreed to pay, and did pay, a then-prominent Ukrainian government official ("Ukrainian Official") more than $200,000, and paid for his vacations to Israel on at least five occasions, in exchange for his improper political influence in the process of registering and promoting various Teva drugs in Ukraine.

45.     Throughout that time period, Ukraine had a socialized healthcare system, with the national Ministry of Health coordinating the provision of healthcare to its citizens with regional and local counterparts.  Most healthcare services were provided through government-owned healthcare facilities.  Pharmaceutical products were regulated by agencies under the Ukrainian Ministry of Health.  In Ukraine, drugs were permitted for marketing and sale in Ukraine only after registration by the state, which included clinical testing and examination as part of the

12

approval process.  In Ukraine, since at least 2007, medications for certain socially significant or especially serious illnesses, including MS, were dispensed free by the government.

46.     Ukrainian Official held a number of roles and positions in the government of Ukraine, including Deputy Director of one of the Institutes of the National Academy of Medical Science since at least 2000, Vice President of the National Academy of Medical Sciences since at least 2005, advisor to the sitting President's administration from 2005 to 2009, Deputy Chairman of the Interagency Workgroup for the Issues of Price-Formation for Drugs and Other Medicinal Products, and Member of the Scientific and Expert Council of the State Pharmacological Center of Ukraine.  In those roles and official positions, Ukrainian Official had the ability to influence the Ukrainian government's decision to approve the registration of pharmaceutical products.

47.     Beginning in 2002 and at least until 2009, Teva entered into numerous agreements, signed by Teva executives, with Ukrainian Official whereby he would be compensated for assisting Teva with registering its drugs in Ukraine and corruptly influencing the registration of its pharmaceutical products, including Copaxone, among other activities.

48.     Teva directly and indirectly made use of the mails and of the means and instrumentalities of interstate commerce in connection with and in furtherance of its illegal payments to Ukrainian Official.  For example, although some of the compensation Ukrainian Official received from Teva was in cash, at least seven payments were wired through U.S. correspondent banks.

49.     The invoices for Ukrainian Official's services noted that he was paid for the registrations of Teva drugs, including Copaxone.

50.     During the same time period, Teva also paid for Ukrainian Official to visit Israel numerous times (traveling in business class), and on at least one occasion his wife traveled with him.  For example, one request to authorize payment to Ukrainian Official stated, Ukrainian Official "is helping us very much in advancing Copaxone and Insulins in the Ukrainian market. One of the ways of settling our account with him is funding his trip to Israel once a year."  The request included travel expenses for both Ukrainian Official and his wife.

51.     Teva stopped paying Ukrainian Official at the end of 2009.  Teva Ukraine LLC, Teva's wholly-owned subsidiary in Ukraine since at least 2010, took over the payments in early 2010 to honor the agreement with Ukrainian Official, and paid Ukrainian Official through March 31, 2011.

52.     Teva mischaracterized its payments to Ukrainian Official as legitimate sales and marketing expenses and consultancy fees in its books and records.  As a result, Teva did not, in reasonable detail, accurately and fairly reflect its payments to Ukrainian Official in its books and records.

**C.     Teva's Illegal Payments in Mexico**

53.     In 2011 and 2012, Teva's subsidiary and distributor in Mexico made illegal payments to doctors employed at government hospitals, government officials under the FCPA, to obtain business valued at approximately $16,865,489.

54.     Throughout that time period, Mexico had a public healthcare system that provided universal healthcare to Mexican citizens.  The cost of the public healthcare, including medical care and drug treatments, was subsidized by the federal government.  Most healthcare services were provided through government-owned healthcare facilities.

55.     In 2007, a number of employees in Teva's Latin American Division ("Teva Miami") became concerned that Teva Mexico may have violated the FCPA.

56.     For example, they heard that a Teva Mexico manager routinely entertained Mexican government officials at a Cancun hotel to increase sales of Teva drugs in Mexico.  At the time, Teva Mexico did not report to Teva Miami, but instead reported directly to Teva.

57.      On or about February 23, 2007, an anonymous letter was delivered to a Teva internal auditor stating, among other things, that Teva Mexico was authorizing illicit payments to government officials as an incentive to increase sales.

58.     As a result of that letter, Teva initiated an internal investigation in 2007.  The internal investigation was completed in 2008, and found credible evidence of illegal payments by Teva Mexico to government officials in Mexico to influence regulatory and formulary approvals, drug purchase decisions, and prescription decisions, and to develop strategic advantages over competitors.  Eleven Teva Mexico employees were terminated in connection with the investigation.

59.     After the investigation, Teva's internal accounting controls were still not sufficient to meet the risks posed by Teva's business in Mexico.  As a result, sporadic misconduct in Mexico continued and several Mexican doctors employed at government hospitals continued to receive money from Teva Mexico to prescribe Teva drugs.

60.     In 2011, Teva Mexico's Innovative Business Unit was in charge of Copaxone sales in Mexico.  In early 2011, Teva decreased Teva Mexico's promotional budget for Copaxone.  A Teva Mexico manager requested that the budget be increased, but the request was denied.

61.     Shortly thereafter, the Teva Mexico manager told a subordinate, another manager, that the money that the doctors had been previously receiving as part of the promotions budget would now be paid in cash by Teva Mexico's Copaxone distributor in Mexico.

62.     By this time, Teva had an anti-bribery policy in place, and it required that Teva Mexico conduct due diligence of third parties, such as distributors, and required that third parties sign an anti-corruption acknowledgement form.  In the case of Teva Mexico's Copaxone distributor in Mexico, neither requirement was met.

63.     In April 2011, a Teva employee responsible for overseeing the implementation of the anti-corruption compliance program emailed a senior executive responsible for overseeing compliance in Latin America.  The email stated that a senior Teva executive had "specifically instructed not to implement a robust system that will enable us to monitor and assure that the same doctor wasn't invited to a meal more than three times (for example)" and that "the purpose of the global FCPA tool under development is mainly to automate the manual forms; get a more organized and easy process of authorisations with less paper work."

64.     In January 2012, another Teva Mexico executive and a subordinate met with two executives of Teva Mexico's Copaxone distributor in Mexico.  The parties agreed that Teva Mexico would provide its Copaxone distributor in Mexico additional margins in its sales of Copaxone, through improper discounts.

65.     After the January 2012 meeting, the Teva Mexico manager then gave the same subordinate a list of doctors, their phone numbers, and the amounts of money that they should be paid.  The Teva Mexico manager then directed the same subordinate to call the doctors who had been receiving money from Teva and inform them that they would continue to be paid. Consistent with those assurances, Teva Mexico continued to pay Mexican doctors in 2012.

66.     All doctors paid were health care providers at state-owned and state-controlled hospitals, working under the direction and control of the Mexican government.  Some of these doctors employed at government hospitals were influential neurologists.  Most of the doctors who were paid by Teva Mexico's Copaxone distributor in 2011 and 2012 had also received illegal payments in or around 2007.

67.     Teva Mexico directly and indirectly made use of the mails and of the means and instrumentalities of interstate commerce in connection with and in furtherance of its illegal payments to Mexican officials.  For example, a Teva Mexico manager corresponded with Teva Mexico's Copaxone distributor in Mexico about the delivery of cash to the Mexican officials using emails sent and stored on U.S. servers.

68.     Teva Mexico through its Copaxone distributor paid the Mexican officials between $9,600 and $30,000 each per year to influence their Copaxone prescription decisions.  In 2012, Teva paid Mexican officials approximately $159,000.

69.     Teva Mexico mischaracterized its payments to Mexican officials as legitimate reductions of revenue in its books and records.  As a result, Teva did not, in reasonable detail, accurately and fairly reflect in its books and records its payments to Mexican officials.  Teva Mexico's inaccurate books and records and financial statements were consolidated into Teva's financial statements, which were filed with the Commission.

### Failure to Maintain Adequate Internal Controls

70.     Teva failed to devise and maintain an adequate system of internal accounting controls.  For example, Teva instituted a Code of Business Conduct ("Code of Conduct") in February 2006.  The Code of Conduct contained a section on the FCPA which prohibited employees "from directly or indirectly authorizing, offering, promising or giving anything of

value to a foreign government official as a means of influencing or inducing the official to obtain or retain business for Teva." Additionally, the Code of Conduct contained a section on financial reporting that prohibited "false, artificial, misleading, or deceptive entries [ ] in any of the books, records or accounts of the Company."

71.    Teva failed to take reasonable steps to publicize or enforce its Code of Conduct. Despite the existence of the Code of Conduct, employees were not familiar with the Code of Conduct's prohibitions and were not trained about the FCPA or the implications of dealing with doctors employed at government hospitals or government tenders.

72.    Teva first learned of potential violations of the FCPA in Latin America in 2007, and its internal investigation, confirming FCPA violations, was completed in 2008. Yet, Teva only rolled out an Anti-Corruption Policy in Latin America in 2009 at the behest of Teva Miami's management. And despite conducting business in a number of high risk countries, Teva did not roll out a global Anti-Corruption policy until the summer of 2010, three years after learning of the first FCPA issues, and Teva employees did not begin to receive training until that time. The Anti-Corruption Policy had a number of requirements that were not implemented in time to prevent Teva's illegal payment schemes. For example, the Anti-Corruption policy required that due diligence be conducted on third parties such as distributors. However, in some cases Teva did not attempt to conduct due diligence on third parties until 2013.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Unlawful Payments to Foreign Government Officials in Violation of Section 30A of the Exchange Act**

73.    Paragraphs 1 through 72 are re-alleged and incorporated by reference.

74.      As described above, Teva, through its officers, directors, employees, or agents corruptly offered, promised to pay, or authorized unlawful payments to one or more persons, while knowing that all or a portion of those payments would be offered, given, or promised, directly or indirectly, to foreign officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their lawful duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality thereof to assist Teva in obtaining or retaining business.

75.      By reason of the foregoing, Teva violated, and unless enjoined, is reasonably likely to continue to violate the anti-bribery provisions of the FCPA, as codified at Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

### SECOND CLAIM

**Failure to Keep Accurate Books and Records in Violation of
Section 13(b)(2)(A) of the Exchange Act**

76.      Paragraphs 1 through 72 are re-alleged and incorporated by reference.

77.      As described above, Teva, through its officers, agents, subsidiaries, and affiliates, failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

78.      By reason of the foregoing, Teva violated, and unless enjoined, is reasonably likely to continue to violate the books-and-records provisions of the FCPA, as codified at Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

## THIRD CLAIM

**Failure to Devise and Maintain Internal Accounting Controls in Violation of
Section 13(b)(2)(B) of the Exchange Act**

79.     Paragraphs 1 through 72 are re-alleged and incorporated by reference.

80.     As described above, Teva, through its officers, directors, employees, or agents

acting on its behalf, failed to devise and maintain a system of internal accounting controls

sufficient to provide reasonable assurances that:  (i) payments were made in accordance with

management's general or specific authorization; and (ii) payments were recorded as necessary to

permit preparation of financial statements in conformity with generally accepted accounting

principles or any other criteria applicable to such statements, and to maintain accountability for

its assets.

81.     By reason of the foregoing, Teva violated, and unless enjoined, is reasonably

likely to continue to violate the internal-accounting-controls provisions of the FCPA, as codified

at Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.     Permanently enjoining Teva from violating Sections 30A, 13(b)(2)(A), and

13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78dd-1; 78m(b)(2)(A) and (B)].

B.     Ordering Teva to disgorge ill-gotten gains, with prejudgment interest, wrongfully

obtained as a result of its illegal conduct.

C.     Granting such further relief as the Court may deem just and appropriate.

D.     Further, the Commission respectfully requests that the Court retain jurisdiction

over this action in order to implement and carry out the terms of all orders and decrees that it

may enter, or to entertain any suitable application or motion by the Commission for additional

relief within the jurisdiction of this Court.

Dated:   December 22, 2016                    Respectfully submitted,


                                              s/ *Jenny Trotman*
                                              Jenny Trotman
                                              Senior Counsel
                                              Court ID No. A5501913
                                              Direct Dial: (305) 982-6379
                                              E-mail: trotmanj@sec.gov

                                              Russell Koonin
                                              Senior Trial Counsel
                                              Fla. Bar No. 474479
                                              Direct Dial: (305) 982-6385
                                              E-mail: kooninr@sec.gov

                                              Attorneys for Plaintiff
                                              **SECURITIES AND EXCHANGE**
                                              **COMMISSION**
                                              801 Brickell Avenue, Suite 1800
                                              Miami, Florida 33131
                                              Telephone: (305) 982-6300
                                              Facsimile: (305) 536-4154

Of Counsel:

Thierry Olivier Desmet
Assistant Director, FCPA Unit
Fla. Bar No. 0143863
U.S. Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida  33131